Good morning, Your Honors. May it please the Court. My name is William Goode, and I represent Marilynne Robinson. As a matter of law, Marilynne Robinson is disabled. Her major life function was her difficulty in seeing and her ambulatory limitations. And as a matter of law, there's no evidence in this case that opposed the fact that she was disabled. The central issue in this case is whether or not there's a reasonable accommodation. And there's also no evidence in this case that there was any accommodation for her ambulatory needs. There was a cross-motion filed, and the defendant's responses in a concise statement simply do not have any evidence. In the excerpts of record, for example, number 48 says speculation. Number 46, there's just no evidence with it in that response. Number 44, the defendant says does not know whether the allegations are true or not. There's just simply no evidence supporting these concise statements. Now, the question is whether or not this accommodation was reasonable to provide in the workplace that was not provided in Ms. Robinson. Perhaps you want to first address the question whether it's necessary to provide an accommodation outside the workplace under the Rehabilitation Act. Well, she did have an accommodation for a short period of time when she was allowed to telecommute from the Bonneville Power Administration headquarters. When she was there, that meant she had smooth walking surfaces to walk over. At her workplace or at her home? No, at the Bonneville Power Administration, at headquarters. In Portland? In Portland, that's right. Her workplace is in Vancouver. Her workplace was in Vancouver. And in Vancouver, we have three modular buildings separated by outdoor decking, and each of the hallways are open on the ends, and in January, they get wet. And did she ask the employer to accommodate her ambulatory difficulties? Yes, she did. The difficulty that we have here in this evidence is the timing. The situational temporary telecommute agreement was signed in the spring or early winter of 2005. Litigation was ongoing. One of the cases was on remand from this court. She had her fifth hip replacement in August of 2005 while she was on a leave of absence. The telecommute agreement had already been revoked. It was never checked as an accommodation. It was only temporary. She came back to the Bonneville Power Administration because that's where her desktop computer was set up earlier. In November of 2005, and as soon as her supervisor discovered that she was back in the workplace, she ordered her workstation packed up and moved back to Vancouver. So in November of 2005, there was no accommodation being made because as soon as the supervisor learned she was back at work, she ordered her back. In December, her orthopedic surgeon issues this letter basically saying, this is August, she had her fifth hip replacement, and if she suffers a fall or a slip, then she'll be bedridden for life. Is this the letter from Alberts? Yes. She recommended just accommodations that she could shift her physician and stand and sit at will. Well, the difficulty with the doctor's letter is the doctor doesn't necessarily know what exists in the workplace, that is three modular buildings connected by decking, but the doctor specifically addressed the hazards that Ms. Robinson was faced with in wet weather under slippery conditions and that that risk was an unacceptable risk and that if she slipped and fell, she would be permanently bedridden. And did she request for an accommodation relating to the wooden, I guess it was like slat, pathways? Ms. Robinson, it wasn't to her to design the workplace. In January, after she had been ordered back to the TTC building Could you answer the question that Judge Okuda put to you? Did she request an accommodation? She didn't specifically say, please cover all the wooden work surfaces in the hallways. No, she did not ask for that. Did she request to go back to Portland headquarters as she had on a temporary basis? Right. She did ask to work from a place that she could, you know, ambulate her out. Please listen to my question. Okay. Did she ask to go back to the Portland BPA headquarters or did she say, I want to go home to telecommute? She asked to go back to headquarters. Okay. She wanted to go back to headquarters. That was the request that she had made. She had sent another letter in January and she also sent along the unsanitized versions of the doctor's letter. Please look at this. This is my risk. You know, I can't subject myself to being in inclement weather in a place where I'm going to slip and fall. You know, I need to have an accommodation. And she didn't get that. Where is that in the record? I just wanted to look at that. My impression was that she asked to be allowed to telecommute full time from her home. Do you have any letter that you can point out to me or any other evidence in the record showing she wanted to go back to Portland BPA headquarters? Well, she asked to telecommute. And in January, she didn't have any restriction from driving at that point. And so, you know, she could have gone back to headquarters and telecommuted from there. I'm sorry. Let me try again. Can you point to any record citation of a request by Ms. Robinson after her hip replacement to go back to the BPA headquarters in Portland where she had been telecommuting on a temporary basis earlier? Yes or no. My understanding is that she had request that agreement when she filed her grievance with the union after she had been ordered back to Vancouver. And is that in the record, the grievance? The grievance itself is not on the record. So what is the record evidence that we have that she requested an accommodation to allow to be telecommuting from someplace other than her home after the hip replacement? I'll tell you what. Obviously, unless you're going to find it right this second, you're going to have a chance to respond. And why don't you look for the answer to that question while we're hearing from the other side. Okay. Good morning, Your Honors. May it please the Court. Kelly Zusman appearing on behalf of the United States. And if you can keep your voice up, please. I will. Thank you, Your Honor. In answer to Judge Faya's question, it is in the record, and it's at ER 338. The claim here that remained for the district court and for this court was one of telecommuting from home. And at ER 338, that's the final operative complaint that Mrs. Robinson filed and that the district court considered. And she claims at that point, at the part of her complaint, that Bonneville denied a reasonable accommodation when it forced her to return either to Vancouver or Portland and denied her request to telecommute from home. I see. So the district court, and if you look at the district court's opinion, and you lay it against the opening brief, I think it is somewhat confusing. The district court analyzed this case as one of the plaintiff requesting to telecommute from home. And the reason she did so is because that was the sole claim included within her complaint. Now, the district court then looked at exactly what the plaintiff needed. I'm sorry. I'm confused. Judge Faya asked for something in the record that shows that she asked to be allowed to work in Vancouver. You've pointed us to the complaint. That's correct. What evidence do we have? Obviously, this is a summary judgment case, right? That's correct. So we're not doing 12B6. So the complaint filed in the district court isn't evidence of her having asked for a cadet accommodation to her employer. This is the complaint. And if I may, the separate question of is there any evidence in the record that she requested modifications to the Vancouver facility, the answer is no. Is there any evidence in the record that she asked to be allowed to work in Portland as an accommodation? The answer is no. Then I'm going to cross that out. And if I may just clarify, early on, when she first began experiencing eye problems in January of 2005, she did request to work in Portland, and that was granted. But once we get past the medical leave, when she returns from the eight months of medical leave, she then demands telecommuting from home and only telecommuting from home. All right. So just to make it perfectly clear, after the hip replacement, she never requested to go back to Portland headquarters to telecommute as she had before, correct? That's correct. She only requested to telecommute from her home, and she logged in 477 hours with limited production, correct? Correct. With one clarification, she logged 212 hours from home with no evidence of having performed work, and then she logged an additional 200-plus hours at the Portland facility immediately after her return from the hip replacement surgery. So has that answered your questions on that point? Now you've confused me. Okay. You've told me that she didn't request to go to Portland after her hip surgery. Now you've told me she logged 200 hours at Portland after her hip surgery. That's correct. And that's because as soon as she was released to return to work following her hip surgery, all of her equipment was still at the Portland headquarters. So she returned to work part-time for approximately two months. She was working in Portland, but that was because her computer equipment was there, not because she requested to work there. And her supervisor, Ms. Howell, made it very clear that as soon as they could get everything boxed up and move to Vancouver, that was where she expected her to report. What was this time period for the other 200 hours that she was in? 212 hours that she telecommuted from home. The second period you're talking about, what was that time frame? That was November of 2005 through January of 2006, up until the time that she then terminates and applies for disability retirement. Okay, so during that period she was in Portland. That's correct. Thanks. So what the district judge did here was construing the claim of, I want to telecommute from home. The district court then looked at what did Bonneville offer in terms of an accommodation for her medical needs. Now, in answer to earlier questions about exactly what was it that she asked for, we know that Ms. Robinson relied upon the letter from Dr. Albers, that's ER-223. Nothing in that letter or any of the other letters from her medical providers stated or implied that telecommuting from home was required. What Dr. Albers says is that she could return to work. Both of her doctors were given copies of her job description, and both of them knew what she did. They knew it was a sedentary position, that 75% of her work was performed at a computer. They both looked at that and said she can return to work. Now, Dr. Albers recommended that she be allowed to stand and stretch periodically, and that was granted. Her eye doctor, Dr. Bentley, said she should only drive during daylight hours, and that was granted. So everything that her doctors said that she needed as an accommodation to return to work, Bonneville granted. And that's undisputed, and that was the basis for the district court's conclusion here that summary judgment was proper on the one remaining claim, and that is the claim of reasonable accommodation. How do you stand on the issue of whether she's entitled to have a complaint under Section 501 or 504? And as we explained in our reply to the motion, we think the complaint needs to be amended. It can either be amended by your granting the request for relief under 1653 or returning it to the district court for consideration under Rule 15. But we certainly do not oppose the amendment to allege the correct statute. It won't make any difference in the result of the case? No, it will not. Okay. Unless there are any further questions from the Court, thank you all so much. Thank you very much. Mr. Goode, would you like a minute? One minute, Your Honor. Excerpts of record page 227 is Marilyn Robinson's letter or memo to the reasonable accommodations, to the nurse and to the reasonable accommodation coordinator, P.J. Johns. This is where she points out her risk. There's nothing in this memo where she's indicating that she wants to return home. What she's doing is she is pointing out the risk of the bad weather and the hazardous conditions. Now, what the physicians don't know, they know that she had a sedentary position, but what they don't know is they don't know that her actual workstation is in a modular trailer, separated by outdoor decking that's open to the elements. That's what they don't know. And all the parties involved in this correspondence do know that. And this is where she is pointing out that she has a, I have to take as a result of bad weather or other hazardous conditions. She's talking about the ultra-high risk that she has to take. Obviously, she would not have that ultra-high risk at the Bonneville Power Administration headquarters building that isn't subject to outdoor decking. I've got to read pretty deep between the lines to construe this as a request to work at Portland. Well, what the parties didn't do at this point is the Bonneville Power Administration never engaged in any interactive process to try to find a reasonable accommodation for Ms. Robinson. That did not happen. Now, they had promised to come over and inspect her station at the TTC, but the record shows that also did not happen either. Thank you very much. The case of Robinson v. Bodman is now submitted for decision. The last case on the argument calendar this morning is United States v. a certain amount of U.S. currency. I might make an irresponsible comment. I think the United States government is generally operating as against a lot of U.S. currency.
judges: Fletcher W. , Bea, Ikuta